TRINA A. HIGGINS, United States Attorney (#7349)
MICHAEL J. THORPE, Assistant United States Attorney (#11992)
SAM PEAD, Assistant United States Attorney (#11945)
Attorneys for the United States of America
111 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Michael.Thorpe@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>BRANDON REDFOOT,<br><br>    Defendant. | Case No. 2:18-cr-00527-CW-1<br><br>UNITED STATES'<br>TRIAL MEMORANDUM<br><br>Judge Clark Waddoups |

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits its Trial Memorandum to the Court in the above-captioned case.

## I.    STATUS OF THE CASE

On September 28, 2022, the Grand Jury returned the Second Superseding Indictment was returned against Brandon Redfoot ("Defendant"). The five counts alleged against Defendant are:

**COUNT I**: 18 U.S.C. §§ 1111(a) and 1153(a), Murder in the Second Degree While Within Indian Country;

      **COUNT II**: 18 U.S.C. §§ 113(a)(3) and 1153(a), Assault with a Dangerous Weapon While Within Indian Country;

      **COUNT III**: 18 U.S.C. § 922(g)(1) Felon in Possession of a Firearm and Ammunition;

      **COUNT IV**: 18 U.S.C. § 924(c) Discharge of a Firearm During and in Relation to a Crime of Violence (relating to Count I);

      **COUNT V**: 18 U.S.C. § 924(c) Discharge of a Firearm During and in Relation to a Crime of Violence (relating to Count II).

A jury trial is set to begin in this matter on October 24, 2022. The United States intends to call approximately 27 witnesses[1] and introduce approximately 200 exhibits. The United States anticipates that its case-in-chief will be concluded by November 2, 2022.

## II.    SUMMARY OF THE FACTS

The government anticipates[2] that the evidence presented in the case-in-chief will establish the following facts, and include the following:

On June 7, 2018, the Defendant was with Rachel Cornpeach in her white Dodge/Ram truck. The Defendant and Ms. Cornpeach had a romantic relationship at that time. They ended up meeting up with, and giving a ride to, a few other persons during the course of the day. Specifically, Latoya Garrison and Damon Garfield were picked up at a house in Ft. Duchesne, Utah, and Dayna Barcindebar was picked up at a house in Randlett, Utah.

---

[1] The United States has yet to serve a subpoena on two of the witnesses, due to the inability to locate these witnesses. One other witness has expressed an unwillingness to participate in the proceedings.

[2] The recitation of facts set forth herein is made in good faith, consistent with the statements and evidence developed from witnesses during the course of the investigation in this matter. Representations made herein are what the United States anticipates will be adduced at trial.

That same day, Julio Rodriguez (victim) was with his girlfriend, Rosa Garcia, in her red Dodge/Ram truck. They had picked up a friend, Jarrod Murray, from his trailer home at some point during that day. The three later went to the residence of Tesha Gardner in Randlett, Utah, where they met up with Tesha and her friend Lily Garcia (who is Rosa's niece). They all decided to go to a store in Randlett known as the "Merc." Julio, Rosa, and Jarrod went to the Merc in Rosa's red truck, while Tesha and Lily went in Tesha's blue truck.

Shortly after the people in the blue and red trucks arrived at that Merc, the Defendant, Rachel, Latoya, Damon, and Dayna went to the same store. The Defendant drove these people in Rachel's white truck.

**The Merc**

Some of these people went into the store, while others remained in their respective vehicles. Tesha, who has a child with the Defendant, did not want to see or interact with him. Fearing the Defendant would make trouble, Tesha left the Merc and drove back to her residence - a very short drive away to the east (still within Randlett) - with Lily accompanying her.

At some point, Julio interacted with Damon Garfield near the parked white truck where the Defendant was seated in the driver's seat. Without explanation, the Defendant got out of the truck and charged toward Julio. A fight ensued between the two men and ended when Rosa yelled that they needed to stop before the police were called. By most accounts, Julio bested the Defendant.

### *White and Red Trucks Leave in Different Directions*

After the fight, the Defendant got up and back into the front passenger's seat of the white truck. Rachel was, at this point, in the driver's seat of the white truck with Latoya, Damon, and Dayna seated in the back seats. Once everyone was in the truck, Rachel drove <u>westbound</u>, toward Fort Duchesne.

After the fight had ended, Rosa, Julio, and Jarrod got back into Rosa's red truck (Rosa was driving) and immediately drove <u>eastbound</u> to Tesha's house. Tesha had backed her blue truck into an area near her house. Rosa did the same - backing into a parking spot near Tessa's blue truck, in front of the home with her windshield facing the road.

### *White Truck Turns Around*

While they were driving westbound, the occupants of the white truck teased the Defendant about getting bested in the fight with Julio. The Defendant was angry and pulled out a firearm from his backpack and told Rachel to turn the car around and drive him back where Julio and his companions were. Rachel complied and turned the white truck around in an <u>eastbound</u> direction.

### *The Shooting at Tesha Gardner's Home*

Rosa and Julio sat in the driver and front passenger's seat, respectively, of Rosa's parked truck. They saw the same white truck from the Merc drive slowly past and turn around near a neighboring driveway. Within a few short moments, they were being shot at by the Defendant. As the Defendant shot, he walked toward Julio and Rosa.

4

When the Defendant started shooting, Latoya and Dayna got out of the white truck and hid in an area with trees adjacent to Tesha's home.

Rosa and Julio jumped out of her truck and tried to find cover from the incoming bullets behind it. Given the position of the truck relative to Defendant's incoming shots, Julio was in an area without coverage. Julio looked toward Rosa. Rosa heard a "thud." Julio started touching around his body and discovered blood coming from the back part of his head. Rosa realized Julio had been shot.

The Defendant climbed back into the white truck and told Latoya and Dayna to get back into the white truck, but they refused. The Defendant then fled the area in the truck with Rachel and (presumably) Damon in that vehicle.

***Attempted Medical Treatment***

Rosa, knowing this was an area where they could not get phone coverage, had others help her get Julio into her red truck. She immediately drove Julio to the ambulance garage in Ft. Duchesne, Utah. Upon arrival, Rosa banged on the door and windows of the garage to get medical help. Emergency Medical Technicians Sandra Lamb and Connie Jones responded to Rosa's pleas and did their best to help get Julio out of the truck, on a gurney, and into the ambulance. At this point, the Defendant was unconscious and unresponsive. EMTs provided as much medical care as they could while transporting Julio to the hospital (the Uinta Basin Medical Center in Roosevelt, Utah).

At the hospital, medical staff attempted to save Julio's life, but knowing the state he was in, had him life-flighted to the University of Utah hospital in Salt Lake City, Utah. Medical staff at this hospital also did what they could to help Julio, but it was determined

on June 8, 2018, that he was effectively dead, and the ineffectual attempts to prolong life were stopped. Though Julio was effectively dead as of June 7-8, 2018, his body's organs stopped working on June 11, 2018.

An autopsy was performed by Dr. Joseph Pestaner from the Utah Medical Examiner's Office who opined that Julio's cause of death was a gunshot wound to the head, and that the manner of his death was a homicide. The medical examiner determined that the gunshot that hit Julio in the back of the head was not fired from close range.

***The Investigation***

After the shooting, officers and agents from the BIA and FBI investigated the shooting scene and collected a number of items that included approximately 30 spent shells (casings) and bullets and fragments. Law enforcement also took a number of pictures and interviewed all known witnesses.

Law enforcement quickly identified the Defendant as the shooter and attempted to find him. The Defendant was found later that night at a house in Fort Duchesne. As they watched the residence, law enforcement saw the Defendant come outside to the white truck, and then, upon realizing law enforcement was present, immediately darted back into the house. He refused to come out – requiring law enforcement to make multiple calls for the Defendant to come outside. The Defendant eventually relented and was taken into custody.

After being taken into custody, the Defendant made multiple voluntary and spontaneous statements to multiple law enforcement persons about how the shooting was his doing alone, and that no one else should be charged.

### *The KelTec Firearm*

In performing additional investigation into this case, law enforcement learned that the Defendant and Rachel Cornpeach went to a pawn shop / federal firearms licensee on or about May 23, 2018. Rachel Cornpeach purchased (with the Defendant present) a black KelTec Sub-2000 9mm rifle and an extended magazine with a capacity for 32 rounds of 9mm ammunition. The description given by witnesses of the firearm the Defendant had shot toward Julio and Rosa, and Tesha's house on June 7, 2018, is consistent with this type of firearm. Rachel posted a picture of the Defendant shooting this firearm on or about May 23, 2018, at an outdoor shooting range.

One of the witnesses interviewed, Katherine Standingrock (mother of Tesha Gardner and grandmother to the child of Tesha and the Defendant), stated that prior to the shooting, the Defendant had been in her car with Tesha. While driving, the Tesha and Defendant began arguing, so Katherine kicked them out of her car. When the Defendant got out of her vehicle he accidentally left behind a backpack. He later asked to have the backpack returned, but prior to giving it back to him, Katherine looked inside of it. She saw a firearm that she described as an "uzi" in style that was black. She gave the backpack (with the gun inside) back to the Defendant. Tesha also stated that, prior to the shooting, the Defendant had pulled a gun on her and described the gun as one that unfolds and locks into place.

A few days after the shooting, law enforcement in Vernal, Utah, responded to a "domestic call" related to the Defendant's mother, Jaylynn Redfoot, and her boyfriend

William Carter. During this incident, law enforcement performed a lawful search of Jaylynn's residence and discovered an empty box for a KelTec Sub-2000 9mm folding rifle. The empty KelTec box also contained a smaller empty box for an extended ammunition magazine. The serial number on the KelTec box matches the firearm purchased by Rachel Cornpeach on May 23, 2018, and the item numbers on the magazine box also matched the purchase and receipt for the purchases made by Rachel Cornpeach at the pawnshop / federal firearms licensee on May 23, 2018.

A forensic analysis was conducted on the shell casings collected at the scene of the shooting and on bullets / fragments retrieved from the red truck, the crime scene, and Julio's autopsy (from his head). Earl Gliem, a physical scientist with the FBI, rendered an expert opinion that some of the bullet fragments – those recovered from the white dodge, Julio's head, Rosa's truck, and Tesha's residence – could have been fired from a KelTec carbine. He further opined those 29 casings recovered from the scene at Tesha's home could have been fired from a KelTec carbine.

### III. TRIAL ISSUES

A. **Self Defense**

The United States anticipates that the Defendant may assert a claim of self-defense during this trial. "A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response." *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014). While a Defendant's burden of production is not "onerous" there must still be "evidence sufficient for a reasonable jury to find in his favor." *Id*. at 567-568. Should the Defendant fail to

meet this burden of production, the United States will object to the jury being instructed on self-defense. Should the evidence in fact be sufficient for a reasonable jury to find the Defendant acted in self-defense, the United States will submit proposed jury instructions relating to this issue.

### B. Witnesses' Prior Statements

The incident related to the crimes charged in this case occurred on or about June 7, 2018; over four (4) years ago. In the days after the shooting, law enforcement interviewed a number of witnesses and recorded those interviews. Many of these witnesses will testify at trial, some of whom may not remember everything they declared at the time of the initial investigation. The United States will seek to use the recording of these interviews and/or transcripts from the recording to refresh the witnesses' recollection of their statements pursuant to the legal doctrine of "present recollection refreshed" and Rule 612 of the Federal Rules of Evidence. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1949); *see also O-Quinn vs. United States*, 411 F.2d 78, 79-80 (10th Cir. 1969).

Should the recording or transcript not in fact refresh the witnesses' knowledge, this will mean that the matter being questioned about was once known to the witness but that the witness cannot recall the matter enough to testify accurately and truthfully. In such circumstances, Federal Rule of Evidence 803(5) permits the record to be read or the recording to be played for the jury like other testimonial evidence, though not admissible as an exhibit. *See United States v. Mayhew*, 2011 U.S. Dist. LEXIS 13906, 2011 WL 601546, at *2 (D. Utah February 11, 2011), *See United States v. Sollars*, 979 F.2d 1294,

1298 (8th Cir. 1992) (citing a recorded recollection is admissible hearsay if the witness once had knowledge, but no longer has sufficient recollection to testify and the matter was recorded when fresh in the witness' memory). In such an event, the United States will demonstrate (via questions) that the entirety of the statement was made to law enforcement when the matter was fresh in the witness's memory and that the declaration reflected the witness's knowledge at the time the declaration was made. The United States will then seek admission of the statement by having the statement read into evidence, or playing the recording of the statement pursuant to Rule 803(5) of the Federal Rules of Evidence.

At times, the United States may also allude to witnesses' prior statements in their examination of the witness pursuant to Rule 613 of the Federal Rules of Evidence.

### C. Potential Hostile Witness Treatment

It is expected that some witnesses subpoenaed and called by the United States may be hostile towards the United States and their attempt to prosecute this matter. Should this happen and become evident, the attorneys for the United States will lay an appropriate foundation and ask for permission to treat any such witnesses as hostile pursuant to Federal Rule of Evidence 611(c)(2).

### IV. STIPULATIONS

The United States and counsel for the Defendant have been able to agree to the stipulation of certain facts, thus obviating the need from several witnesses. Specifically, the parties agree that the Defendant, Brandon Redfoot, is an Indian, as defined by federal law and that the events of Counts I, II, IV and V occurred withing Indian Country, as

defined by federal law. The parties have further stipulated that the KelTec 9mm firearm and ammunition that the Defendant is alleged to have possessed in this case were "in and affecting commerce." Finally, the parties stipulate that the blood found on a rock at the scene of the shooting in the front of Tesha Gardner's residence was tested for serology and DNA, and compared to a known blood sample from Julio Rodriguez, and the blood from the rock was ultimately found to belong to Julio Rodriguez.

## V.  GOVERNMENT'S WITNESS LIST

The government anticipates that it will call the following witnesses to testify at trial:

*Tuesday, October 25, 2022*

1. Rosa Garcia, the Julio Rodriguez' girlfriend and alleged victim as it relates to Count II of the Second Superseding Indictment;
2. Trace Reary, Employee at Red Rock Pawn;
3. Mike Gledhill, Vernal City Police Department;
4. William Carter, former boyfriend to Defendant's mother;
5. Jaylynn Redfoot, Defendant's Mother;

*Wednesday, October 26, 2022*

6. Rachel Cornpeach, former girlfriend of Defendant and former co-defendant;
7. Matthew Navanick, neighbor to Tesha Gardner;
8. Yolanda Navanick / Nunez, mother of Matthew Navanick;
9. Latoya Garrison, associate of Damon Garfield;
10. Dayna Barcindebar;

11. Ben Wero, Sr., neighbor to Tesha Gardner;

*Thursday, October 27, 2022*

12. Katherine Standingrock, Tesha Gardner's mother;

13. Tesha Gardner, Defendant's former partner and mother to his child;

14. Lily Garcia, associate of Tesha Gardner;

15. Damon Garfield, friend of Defendant;

*Friday, October 28, 2022*

16. Eric LaRose, former Ute Tribal Investigator;

17. Troy Thompson, Bureau of Indian Affairs law enforcement officer;

18. Sandra Lamb, Emergency Medical Technician;

19. Connie Jones, Emergency Medical Technician;

20. Dr. Amos Burgess, treating physician Uintah Basin Medical Center;

21. Dr. Safdar A. Ansari, treating physician University of Utah;

*Monday, October 31, 2022*

22. Jarrod Murray;

23. Shannon Prince, Forensic Examiner – latent prints;

24. Corick Christopherson, former cellmate to Defendant;

25. David Ryan, Special Agent FBI and case agent;

*Tuesday, November 1, 2022*

26. Earl Gliem, Forensic Examiner – Firearms / Toolmarks;

27. Dr. Ed Pastener, medical examiner.

This witness list and outline may be subject to change as the United States assesses the best manner to present its case-in-chief.

## VI. UNITED STATES' EXHIBIT LIST

The United States' list of proposed exhibits has been filed. Many of the exhibits are photos of the crime scene and the respective vehicles. Foundation for these photographs will be supplied by familiar witnesses, but the defense has not opposed the introduction of most of these exhibits. Tangible exhibits will also be presented during the case-in-chief. Foundation for these exhibits is not anticipated to be opposed but may be supplied by the familiar witnesses for each.

The United States will also be presenting demonstrative exhibits of satellite imagery of the Randlett, Utah, area as photographs to orient the jury to the location of the involved locations. Foundation for these exhibits is expected to be unopposed, but may be supplied by Agent Ryan, who has worked and lived in the area for several years.

The United States will be utilizing a diagram during its case-in-chief to help demonstrate the location of cartridge casings recovered from the crime scene. A demonstrative exhibit may be used during the examination of Mr. Gliem, for purposes of education the jury on the components of a bullet cartridge and firearm toolmarks.

RESPECTFULLY SUBMITTED this 15th day of October 2022.

> TRINA A. HIGGINS
> United States Attorney
>
> /s/ Michael J. Thorpe
>
> MICHAEL J. THORPE
> Assistant United States Attorney